**UNITED ENERGY SERVICES, INCORPORATED, Petitioner,**

v.

**FEDERAL MINE SAFETY & HEALTH ADMINISTRATION; Federal Mine Safety and Health Review Commission, Respondents.**

No. 93–2520.

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1994.

Decided Sept. 23, 1994.

**ARGUED:** Ricklin Brown, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, for petitioner. Elizabeth Hopkins, U.S. Dept. of Labor, Washington, DC, for respondents. **ON BRIEF:** Monica K. Schwartz, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, for petitioner. Thomas S. Williamson, Jr., Sol. of Labor, Allen H. Feldman, Associate Sol., for Sp. Appellate and Supreme Court Litigation, Steven J. Mandel, Deputy Associate Sol., U.S. Dept. of Labor, Washington, DC, for respondents.

Before MURNAGHAN, Circuit Judge, PHILLIPS, Senior Circuit Judge, and HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Senior Circuit Judge PHILLIPS wrote the opinion, in which Judge MURNAGHAN and Judge HILTON joined.

## OPINION

PHILLIPS, Senior Circuit Judge:

This petition for review requires us to examine the regulatory jurisdiction of the Federal Mine Safety and Health Administration (MSHA) under the Federal Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. §§ 801 *et seq.*, in relation to the regulatory jurisdiction of the Occupational Safety and Health Administration (OSHA) under the Occupational Safety and Health Act of 1970 (OSH Act), 29 U.S.C. §§ 651 *et seq.* It arises from the issuance by MSHA of a citation and six withdrawal orders to the petitioner, United Energy Services, Inc. (United Energy) for alleged violations of the Mine Act in connection with work performed by United Energy at a coal mine. United Energy, contending that its operations were not subject to regulation by MSHA, but only by OSHA, contested the citation and orders on jurisdictional grounds as well as on the merits. The Federal Mine Safety and Review Commission

(the Commission) enforced the citation and orders, concluding in the process that United Energy's operations were covered by the independent contractor provision of the Mine Act, 30 U.S.C. § 802(d) and that MSHA's regulatory jurisdiction preempted that conferred upon OSHA in respect of the conduct in issue. We affirm.

## I

The North Branch Cogeneration Plant, owned by North Branch Partners, Ltd. (NB Partners) and located near Bayard, West Virginia, generates electric power by burning coal waste or "gob." The plant is located next to a coal mine owned by the Island Creek Coal Company (Island Creek). A mile-long gob pile on the adjacent coal mine property is expected to provide the plant with fuel for about ten years. During the relevant period, United Energy maintained and operated the power plant pursuant to a service agreement with NB Partners, including the conveyor belt system which transports gob from the adjacent coal mine to the plant. Although the majority of the conveyor system sits on the property owned by NB Partners, a small portion of the system extends approximately 300 to 500 feet onto mine property.

At the time MSHA issued the citation and orders in question, employees of the mine [1] used bulldozers to load gob from the refuse pile into a device called a dozer trap. The dozer trap deposits the gob onto a conveyor belt. As the gob moves along the belt, a magnet picks up any scrap metal mixed in with the coal waste. The gob eventually is fed into a machine known as a grizzly feeder, which screens out pieces larger than eight inches in diameter. The pieces smaller than eight inches fall onto a conveyor belt which carries the gob to the main conveyor belt located on the North Branch property. With the exception of the bulldozers, all the machinery just described is located on the mine property, but is owned by NB partners and maintained by employees of United Energy. At least one or two United Energy employees work in the mine area every day. In total, the company has about sixteen employees who work in that area.

Once the gob is transported across the property line and is loaded onto the main conveyor belt, it undergoes several processes designed to size and crush the coal. Ultimately, the conveyor belt carries the gob into the plant itself to be burned.

Between February 26 and August 27, 1992, MSHA issued a citation and six orders for violations of the Mine Act in connection with the activities of United Energy employees on the mine property. MSHA officials charged United Energy with failing to comply with the Act's mandatory safety standards and training requirements, and with failing to conduct a monthly electrical examination of the section of the conveyor system located on mine property as required by MSHA regulations.

When MSHA sought to enforce the citation and orders by filing a petition for assessment of civil penalties, United Energy challenged the citation and orders on the ground, *inter alia*, that its operations were not subject to the regulatory jurisdiction of the MSHA, but only to that of OSHA. An administrative law judge vacated and modified some of the orders, but affirmed others and upheld MSHA's assertion of regulatory jurisdiction over United Energy. The ALJ then determined that United Energy was an independent contractor performing services at a coal mine, and that its activities at the mine therefore were governed by the Mine Act. The ALJ found as fact that United Energy's activities in the mine area were sufficiently continuous for jurisdictional purposes under the Mine Act, and that its services were essential not only to the power plant, but also to the extraction of coal because the power plant was the only consumer of the gob. The ALJ specifically rejected United Energy's argument that MSHA had not sufficiently preempted the jurisdiction of OSHA so that OSHA rather than MSHA had regulatory power over its operations.

United Energy petitioned the Federal Mine Safety and Health Review Commission for discretionary review. Upon the Commis-

---

1. The mine has since ceased operations.

sion's denial of the petition, the ALJ's decision became the final decision of the Commission.

This petition for judicial review followed. In it, United Energy only challenges the jurisdiction of MSHA to issue the challenged citation and orders.

## II

■ We have jurisdiction to review this petition pursuant to 30 U.S.C. § 816, which provides for appellate review of orders of the Commission in the United States court of appeals for the circuit in which the alleged violation occurred. The activities at issue took place near Bayard, West Virginia. Because the questions we address are matters of statutory interpretation and the facts are essentially undisputed, the standard of review is plenary.

## A

The first issue presented is whether by virtue of the activities of its employees on the coal mine property adjacent to the North Branch power plant, United Energy is subject to the provisions of the Mine Act. Specifically, the question is whether United Energy is an "operator" within the meaning of section 4 of the Mine Act, 30 U.S.C. § 803. That section sets forth the coverage of the Act:

> Each coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, *and each operator of such mine,* and every miner in such mine shall be subject to the provisions of this chapter.

30 U.S.C. § 803 (emphasis added). An "operator" is defined as "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine." 30 U.S.C. § 802(d). The regulations in turn define an "independent contractor" as "any person, partnership, corporation, subsidiary of a corporation, firm, association or other organization that contracts to perform services or construction at a mine." 30 C.F.R. § 45.2(c) (1993). For the reasons that follow, we find that United

Energy qualifies as an "independent contractor" performing services at a "coal or other mine."

We first address whether the activities of United Energy's employees on the property of Island Creek Coal Company were at a "coal or other mine," and then consider whether United Energy qualifies as an "independent contractor" as that term is defined in 30 U.S.C. § 802(d).

### (1)

The Act defines a "coal or other mine" as

(A) an area of land from which minerals are extracted in nonliquid form ..., (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailing ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, ..., or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(1). The "work of preparing coal" is defined as "the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal ..., and such other work of preparing such coal as is usually done by the operator of the coal mine."

Prior decisions of this court provide some guidance on the interpretive issue. In *Roberts v. Weinberger,* 527 F.2d 600, 601–02 (4th Cir.1975), and *Norfolk & W. Ry. v. Roberson,* 918 F.2d 1144, 1147–48 (4th Cir.1990), *cert. denied,* 500 U.S. 916, 111 S.Ct. 2012, 114 L.Ed.2d 99 (1991), we considered whether an employee—a truck driver in the one case and a railroad operator in the other—who transported raw coal from a mining site to a preparation facility where it was processed before being reloaded for shipment was engaged "in the extraction or preparation of coal." In those cases, we concluded that the employees' activities

were part of the process of "extracting the coal and preparing the coal so extracted." The coal was not extracted and prepared until it was taken from the mine to the place where it was processed and graded so as to be in condition for delivery to distributors and consumers.

*Roberson*, 918 F.2d at 1148 (quoting *Roberts*, 527 F.2d at 602). *See also Norfolk & W. Ry. v. Director*, OWCP, 5 F.3d 777 (4th Cir.1993) (following *Roberts* and holding that locomotive engineer who delivered empty coal cars to coal mine and preparation facility, and transported raw coal to preparation facility was engaged in the preparation of coal).

■ Here, the conveyor belt is the means by which the coal waste is transported to the power plant to be processed. The dozer trap, conveyor belt, and other equipment thus qualify as "structures, ..., equipment, [and] machines" used in the "the work of preparing coal" within the meaning of 30 U.S.C. § 802(h)(1) & (i). United Energy's employees maintained and serviced this equipment and so were working at a coal mine.

United Energy argues, nevertheless, that its activities at the mine site are not part of the "work of preparing coal" within the meaning of 30 U.S.C. § 802(i) because they are not those "usually done by the operator of the coal mine." This phrase embodies a commercial purpose requirement, according to United Energy, and it suggests that a two-step analysis is appropriate in determining whether its activities are governed by the Mine Act. First, are its operations one of the processes covered by the Act? Second, if so, is the coal being prepared for a commercial purpose? According to United Energy, although its activities are one of the enumerated processes in 30 U.S.C. § 802(i), it is not engaged in the preparation of coal because the coal is not being prepared for ultimate release into the chain of commerce. Instead, after United Energy transports and processes the coal, the power plant itself consumes the coal.

We think it irrelevant that United Energy is transporting and delivering the coal to the power plant it operates, rather than to another consumer of coal. The statute sets forth a functional analysis, not one turning on the identity of the consumer, and United Energy's activities meet the functional test. Although delivery of coal to a consumer after it is processed usually does not fall under the coverage of the Mine Act, United Energy's activities occur a step earlier in the overall process. They involve the transportation of coal to the preparation facility and thus are part of the "work of preparing coal."

The purpose of the Act and its legislative history support our conclusion. They suggest that the proper focus of our analysis is on the safety of mining operations and that we should construe broadly the Act's coverage to achieve this goal. *See* 30 U.S.C. § 801; S.Rep. No. 181, 95th Cong., 1st Sess. 1, 14, *reprinted in* 1977 U.S.C.C.A.N. 3401, 3414. The Senate Committee Report states that "there may be a need to resolve jurisdictional conflicts, but it is the Committee's intention that what is considered to be a mine and to be regulated under this Act be given the broadest possible interpretation, and it is the intent of this Committee that doubts be resolved in favor of inclusion of a facility within the coverage of the Act." *Id.* We find no support in the statutory language or the case law for the position that the coverage of employees working at a mine site should depend on the identity of their employer. If the employees of Island Creek were maintaining the dozer trap, conveyor belt and other equipment, instead of United Energy's, they would certainly be protected by the Mine Act's provisions. United Energy's employees are subject to the same risks as any other employee engaged in the "work of preparing coal", and the fact that its employer is the ultimate consumer of the coal does not determine whether those employees are entitled to the protection of the Act. *See also Pennsylvania Elec. Co. v. Federal Mine Safety & Health Review Comm'n*, 969 F.2d 1501, 1504 (3d Cir.1992) (Head drives of conveyor belt used to transport coal to processing station are subject to provisions of the Mine Act regardless of whether preparation facility is under Mine Act's jurisdiction.).

(2)

We next consider whether United Energy is an "independent contractor" performing

services at the mine site. On this issue also, we have guidance from earlier decisions of this court. In *Old Dominion Power Co. v. Donovan,* 772 F.2d 92, 95–97 (4th Cir.1985), we explored the meaning of the term "operator" as defined by 30 U.S.C. § 802(d), and concluded that the legislative history "make[s] clear Congress' intent to define as 'operators' only those independent contractors who are engaged in mine construction or the extraction process, and who have a 'continuing presence' at the mine." *Id.* at 97. That the statute defines an operator as one engaged in the "operat[ion], control[ ], or supervis[ion]" of a coal mine further suggests that an independent contractor must be performing services in some manner related to mining activities. *Id.* (adopting analysis of *National Indus. Sand Ass'n v. Marshall,* 601 F.2d 689, 701 (3d Cir.1979)). Applying this test, we held in *Old Dominion* that an electrical utility whose employees visited the mine about once a month to read a meter installed by the utility was not an "operator" under the Act because its contacts with the mine were infrequent and remote from either mine construction or the extraction process.

■ Given that one or two United Energy employees work daily on coal mine property in connection with the conveyor belt and other equipment owned by NB Partners, United Energy's contacts are certainly sufficiently frequent to constitute a "continuing presence" at the mine. As for the requirement that an independent contractor be involved in the overall extraction process, the activities of United Energy's employees are part of the coal preparation process and thus are sufficiently a part of the mining process to qualify United Energy as an independent contractor covered by the Act. We therefore conclude that United Energy had contacts with the mine site of sufficient frequency and of such a nature as to meet those requirements for being an "independent contractor" performing services at a coal mine. *Cf. Otis Elevator Co. v. Secretary of Labor,* 921 F.2d 1285, 1290–91 (D.C.Cir.1990) (interpreting statutory language to include *any* independent contractor performing services at a mine).

■ United Energy contends, however, that because its contract was with the owner of the power plant, and not with the coal company, it cannot be an "independent contractor" within the meaning of the Act. We disagree. Though it did not contract with the coal company, its contract was to provide services at the mine in connection with the coal company's contractual obligation to NB Partners to deliver gob to the plant. In this circumstance, United Energy's contract with NB Partners satisfies the definition of an "independent contractor." The regulations state that an independent contractor is "any ... corporation ... that contracts to perform services or construction at a mine." 30 C.F.R. § 45.2(c). There is no requirement that the contract be with the owner of the coal mine. The Senate Committee report indicates that Congress' intent in expanding the definition of "operator" to include "independent contractors" was "to thereby include individuals or firms who are engaged in construction at such mine, or who may be, *under contract or otherwise,* engaged in the extraction process *for the benefit of the owner or lessee* of the property." S.Rep. No. 181, 95th Cong., 1st Sess. at 14, *reprinted in* 1977 U.S.C.C.A.N. at 3414 (emphasis added). The activities of United Energy's employees on coal mine property were certainly of benefit to Island Creek. The coal company contracted to deliver gob to the power plant, which was the only consumer of the gob, and United Energy's employees played an essential role in delivery of the gob to the power plant. To qualify as an "independent contractor" under the Act, it is sufficient that United Energy's services are pursuant to a contract with NB Partners and are of benefit to Island Creek.

We therefore find that United Energy is an "independent contractor" performing services at a "coal or other mine," and so is subject to the provisions of the Mine Act. 30 U.S.C. §§ 802(d), h(1) & 803.

## B

■ The second issue is whether MSHA has exercised its statutory authority under the Mine Act in such a way as to preempt OSHA's regulatory jurisdiction under the OSH Act.

Section 4(b)(1) of the OSH Act provides that the "working conditions of employees" are· not subject to its provisions if another federal agency has "exercise[d][its] statutory authority to prescribe or enforce .standards or regulations affecting occupational safety or health." 29 U.S.C. § 653(b)(1). We have interpreted "working conditions," as that term is used in section 4(b)(1), to mean "the environmental area in which an employee customarily goes about his daily tasks." *Southern Ry. v. Occupational Safety & Health Review Comm'n,* 539 F.2d 335, 339 (4th Cir.), *cert. denied,* 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976). Because MSHA has prescribed regulations addressing the area on mine property in which United Energy's employees work, MSHA has preempted OSHA's jurisdiction.

United Energy contends that MSHA has not preempted OSHA's jurisdiction because MSHA failed to exercise sufficiently its statutory authority to regulate the conditions in the area at issue. It claims that certain events [2] demonstrating that it was given conflicting and confusing information about whether it was subject to the provisions of the Mine Act suffice as reasons for our concluding that MSHA failed to exercise its statutory authority as required under section 4(b)(1). Again, we disagree. United Ener-

gy's argument assumes that the enforcement history of the agency is relevant in determining whether MSHA has preempted OSHA's jurisdiction. It is· not. Under section 4(b)(1); MSHA may preempt OSHA's regulatory authority by "exercising statutory authority to prescribe ... regulations affecting" the area at issue. The plain language of that section indicates that this is all that MSHA must· do to preempt this regulatory field. The Third Circuit, in *Pennsylvania Electric Co. v. Federal Mine Safety & Health Review Commission,* 969 F.2d 1501 (3d Cir. 1992), recently has rejected the idea that preemption under section 4(b)(1) turns on the specifics of an agency's enforcement activities: "[W]e need not examine the *enforcement history* of a particular regulation. OSHA § 4(b)(1) is satisfied by the very fact that a regulation with the requisite specificity is promulgated." *Id.* at 1504 (emphasis in original). United Energy does not contest that such regulations have been promulgated by MSHA. It merely argues that MSHA's assertion of jurisdiction was confusing and inconsistent. That contention, however, is simply irrelevant to the preemption inquiry under section 4(b)(1). "The statute does not require us to look beyond the exercise of statutory authority· by the .agency; no language refers to the *quality* or *consistency* of the agency's exercise of statutory authority." *Id.* at 1505 (emphasis in original). Consequently, we affirm the Commission's finding that MSHA has preempted OSHA's regulatory jurisdiction over the conduct in question.

---

**2.** United Energy points primarily to the following series of events: First, during construction of the power plant, plant officials consulted with OSHA representatives about compliance with OSHA regulations, and the plant was constructed to meet those regulations. Later, in July of 1991, a MSHA official inspected the dozer trap, conveyor belt, and other equipment located on mine property and issued citations for violations he saw in the refuse area to Island Creek. He later withdrew those citations, and instead issued citations to Wiley Construction Inc., which was actually operating the dozer trap and conveyor belt at that time. On September 5, 1991, NB Partners requested a jurisdictional determination from the Secretary of Labor as to which agency had juris-

diction over the power plant operations. On February 26 and 27, 1993, before NB Partners received a response, MSHA issued to United Energy the citation and four of the orders in question. On April 8th, 1992, NB Partners received a response to its request indicating that OSHA had jurisdiction over the power plant and MSHA had jurisdiction over all operations on coal mine property. NB Partners did not consider this response a final determination of jurisdiction by the Secretary. In May and August of 1992, the other two orders in question were issued. Apparently, negotiations between MSHA and OSHA continued during this time about which agency had jurisdiction over the operations on the power plant property.

## III

In sum, we affirm the Commission's finding that United Energy is subject to the provisions of the Mine Act as an "operator" of a coal mine in connection with the activities of its employees on the adjacent coal mine property, and also affirm its determination that MSHA has preempted OSHA's regulatory jurisdiction over the conduct at issue.

*AFFIRMED.*